Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email: gnecf@classcounsel.com

*Liaison Counsel for Plaintiff*

[additional counsel on signature page]

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JUDE CHAMBERLAIN, derivatively on behalf of STITCH FIX, INC.,

     Plaintiff,

     v.

KATRINA LAKE, PAUL YEE, MIKE C. SMITH, STEVEN ANDERSON, J. WILLIAM GURLEY, MARKA HANSEN, KIRSTEN LYNCH, and SHARON MCCOLLAM,

     Defendants,

     and

STITCH FIX, INC.,

     Nominal Defendant.

Case No.:

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DEMAND FOR JURY TRIAL

## INTRODUCTION

Plaintiff Jude Chamberlain ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Stitch Fix, Inc. Corporation ("Stitch Fix" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Katrina Lake, Paul Yee, Mike C. Smith, Steven Anderson, J. William Gurley, Marka Hansen, Kirsten Lynch, and Sharon McCollam (collectively, the "Individual Defendants," and together with Stitch Fix, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Stitch Fix, unjust enrichment, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Stitch Fix, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Stitch Fix's directors and officers from June 8, 2018 through the present (the "Relevant Period").

2.     Stitch Fix is an online fashion retail company founded in 2011, based out of San Francisco, California. The Company's primary offering is a personalized fashion subscription service, whereby the Company ships curated boxes of clothing and other apparel, referred to by the Company as "Fixes," to prospective clients, who may pick and choose which items to keep or return.

3.     The Company purports to differentiate itself from its competitors through the use of data science. The Company represents that it makes use of proprietary algorithms and other data analytics

tools to gather swathes of data about its customers' fashion tastes, allowing the Company's stylists to tailor the Company's Fixes to individual customers' specific preferences.

4.      Due to the subscription-based nature of the Company's primary offering, one of the "key metrics" investors use to gauge the Company's profitability is the number and growth of the Company's "Active Clients," which the Company defines as customers who have received a Fix from the Company during a given 12-month period, and have elected to keep or return some or all of the items in the Fix. As the Company has grown over the years, Active Client growth has only grown in importance as a gauge of the Company's future prospects, as it will indicate whether the Company's overall growth will continue indefinitely, or begin to stagnate once all of the "low-hanging fruit" clients have been secured.

5.      Prior to the beginning of the Relevant Period, the Company consistently reported strong Active Client growth. During the fiscal year ended August 2, 2014, the Company reported 261,000 Active Clients, which surged to 867,000 during the following year, 1.67 million the next year, 2.19 million the year after, and finally 2.74 million for the fiscal year ended July 28, 2018.

6.      In 2017, amidst this strong Active Client growth, the Company launched a national television advertisement campaign. Thereafter, in the months leading up to the beginning of the Relevant Period, the Company's Chief Executive Officer ("CEO"), Defendant Lake, would represent on numerous occasions that the Company's television advertisement campaign was an integral driver of the Company's continued Active Client growth. For example, during a conference call held on March 12, 2018 to discuss the Company's earnings for the fiscal quarter ended January 27, 2018, Defendant Lake asserted that the Company's TV advertisements were directly linked to increased signs-ups (i.e., new Active Clients).

7.      However, unbeknownst to the investing public, the Individual Defendants had in fact halted the Company's national television advertisement campaign for 10 weeks out of the 13 weeks in the fiscal quarter ended April 28, 2018, or approximately 80% of the quarter. This decision was made well before the beginning of the Relevant Period. Even more importantly, for the first time in the Company's history, Active Client growth had all but grinded to a standstill during the quarter.

8.      Nonetheless, the Individual Defendants personally made and caused the Company to make multiple statements through SEC filings, press releases, and conferences during the Relevant Period assuring the investing public that the Company was maintaining the levels of positive Active Client growth the Company had consistently experienced prior to the Relevant Period, and that this growth was being driven, in large part, by the Company's television advertising campaign.

9.      The market reacted favorably in response to the false and misleading statements disseminated during the Relevant Period. Various news outlets and investors issued optimistic reports on the Company, and the price of the Company's stock swelled to an all-time high of $51.19 per share at the close of trading on September 17, 2018. Meanwhile, certain of the Individual Defendants sold large quantities of their shares at artificially inflated prices, collecting millions of dollars in proceeds.

10.     The truth emerged during after-market hours on October 1, 2018, when the Company issued a press release and letter to shareholders, revealing, for the first time, that the Company had in fact discontinued its television advertising campaign for nearly the entirety of the fiscal quarter ended April 28, 2018, and that the Company's Active Client growth had plummeted, with the number of Active Clients remaining essentially unchanged from the prior quarter.

11.     Analysts reacted to these revelations with surprise and disappointment, as did the market, with the price of the Company's stock plunging from $44.63 per share at the close of trading on October 1, 2018, to $28.94 per share at the close of trading on October 2, 2018, representing a shocking loss in value of over 35%.

12.     As of December 10, 2019, the Company's stock trades as low as $26.23 per share, nearly half of the peak price the Company's stock had reached during the Relevant Period.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company's Active Client growth had stagnated significantly; (2) the Company had planned to, and did,

discontinue its national television advertisement campaign for 10 out of the 13 weeks comprising the fiscal quarter ended April 28, 2018; (3) the cessation of the Company's national television advertisement campaign was a major contributing factor to the stagnation of the Company's Active Client growth; (4) as a result of the Company's stagnated Active Client growth, the Company's financial prospects and purported "positive momentum" were far weaker than the Company had represented to the investing public; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

14.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $17.8 million.

15.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

16.     In light of the Individual Defendants' misconduct, which has subjected Stitch Fix, its CEO, its Chief Financial Officer (CFO), and its President and Chief Operating Officer ("COO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's, and President and COO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Stitch Fix's Board of Directors (the "Board") cannot consider a demand to

commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

19.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

24.     Venue is proper in this District because Stitch Fix and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Stitch Fix common stock. Plaintiff has continuously held Stitch Fix common stock at all relevant times.

### Nominal Defendant Stitch Fix

Verified Shareholder Derivative Complaint

26.     Stitch Fix is a Delaware corporation with its principal executive offices at 1 Montgomery Street, Suite 1500, San Francisco, California 94104. Stitch Fix's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "SFIX." Stitch Fix's common stock is divided into publicly traded Class A stock, which confers one vote per share, and non-public Class B stock, which confers ten votes per share. The Company's Class B stock converts to Class A stock upon transfer or sale.

**Defendant Lake**

27.     Defendant Katrina Lake ("Lake") founded Stitch Fix and has served as the Company's CEO since 2011. According to the Company's Schedule 14A filed with the SEC on November 7, 2019 (the "2019 Proxy Statement"), as of October 21, 2019, Defendant Lake beneficially owned 142,800 shares of the Company's Class A common stock. Defendant Lake also beneficially owned 12,588,874 shares of the Company's Class B common stock, which represented 27% of the Company's outstanding shares of Class B common stock on that date. Given that the price per share of the Company's Class A common stock at the close of trading on October 21, 2019 was $22.99, Defendant Lake owned approximately $3.28 million worth of Stitch Fix stock.

28.     For the fiscal year ended August 3, 2019, Defendant Lake received $5,327,433 in compensation from the Company. This included $637,288 in salary, $2,067,457 in stock awards, $2,399,998 in option awards, and $222,690 in non-equity incentive plan compensation.

29.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lake made the following sales of the Company's Class A common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 18, 2018 | 66,666 | $25.73 | $1,715,582 |
| June 19, 2018 | 66,666 | $26.27 | $1,751,049 |
| June 20, 2018 | 66,668 | $25.90 | $1,726,501 |
| July 16, 2018 | 66,666 | $32.75 | $2,183,511 |
| July 17, 2018 | 66,666 | $32.87 | $2,191,378 |
| July 18, 2018 | 66,668 | $34.55 | $2,303,579 |
| August 20, 2018 | 50,000 | $32.82 | $1,641,150 |

Thus, in total, before the fraud was exposed, she sold 450,000 Company shares on inside information, for which she received approximately $13.5 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

30.    The Company's 2019 Proxy Statement stated the following about Defendant Lake:

***Katrina Lake.*** Ms. Lake is our founder and has served as our Chief Executive Officer and a member of our Board since our inception in 2011. Ms. Lake holds a B.A. in Economics from Stanford University and an M.B.A. from Harvard University. We believe that Ms. Lake is qualified to serve as a member of our Board based on the perspective and experience she brings as our Founder and Chief Executive Officer.

*Other Public Company Boards:* Ms. Lake has served as a director of GrubHub, Inc., an online and mobile food delivery service, since December 2015.

*Private Company / Non-Profit Boards:* Ms. Lake serves as a director of Glossier Inc.

**Defendant Yee**

31.    Defendant Paul Yee ("Yee") has served as the Company's CFO since June 2017.[1] According to the 2019 Proxy Statement, as of October 21, 2019, Defendant Yee beneficially owned 189,375 shares of the Company's Class B common stock.

32.    For the fiscal year ended August 3, 2019, Defendant Yee received $599,206 in compensation from the Company. This included $448,462 in salary and $150,744 in non-equity incentive plan compensation.

33.    The Company's 2019 Proxy Statement stated the following about Defendant Yee:

*Paul Yee.* Mr. Yee has served as our Chief Financial Officer since June 2017. From April 2013 to June 2017, he served as the Chief Financial Officer of Method Products, PBC, and subsequently as Chief Financial Officer of its parent companies PAD NV and People Against Dirty Holdings Ltd., a green cleaning products company known for its Method and Ecover brands. From June 2017 to September 2017, Mr. Yee served in a limited capacity as a consultant to People Against Dirty Holdings Ltd. as it contemplated a sale to a third party. From 2007 to 2013, Mr. Yee served in multiple capacities at Peet's Coffee & Tea, Inc., a specialty coffee and tea company, including his most recent role as Vice President of Finance & Investor Relations from 2011 to 2013. From 1999 to 2006,

---

[1] On December 4, 2019, Defendant Yee notified the Company of his intention to resign from the Board, effective on January 3, 2020.

Mr. Yee served in multiple capacities at Gap, Inc., a global retailer of clothing and accessories, including in leadership roles in finance and inventory planning. Mr. Yee holds a B.A. in Urban Studies and an M.B.A. from Stanford University.

**Defendant Smith**

34.     Defendant Mike C. Smith ("Smith") has served as the Company's President since October 2018, and as COO from June 2012 through March 2016, and from September 2017 through to the present. He also served as the General Manager of Stitch Fix Men from March 2016 through September 2017. According to the 2019 Proxy Statement, as of October 21, 2019, Defendant Smith beneficially owned 47,830 shares of the Company's Class A common stock. Defendant Smith also beneficially owned 1,209,227 shares of the Company's Class B common stock, which represented 2.6% of the Company's outstanding shares of Class B common stock on that date. Given that the price per share of the Company's Class A common stock at the close of trading on October 21, 2019 was $22.99, Defendant Smith owned approximately $1.09 million worth of Stitch Fix stock.

35.     For the fiscal year ended August 3, 2019, Defendant Smith received $3,020,030 in compensation from the Company. This included $536,288 in salary, $1,066,026 in stock awards, $1,237,500 in option awards, and $180,216 in non-equity incentive plan compensation.

36.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Smith made the following sales of the Company's Class A common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 15, 2018 | 25,000 | $26.55 | $663,675 |
| July 16, 2018 | 25,000 | $33.28 | $832,124 |
| August 15, 2018 | 25,000 | $32.83 | $820,800 |
| September 17, 2018 | 25,000 | $49.73 | $1,243,325 |

Thus, in total, before the fraud was exposed, he sold 100,000 Company shares on inside information, for which he received approximately $3.55 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

37.     The Company's 2019 Proxy Statement stated the following about Defendant Smith:

1
2
3
4
5
6

*Michael Smith.* Mr. Smith has served as our President and Chief Operating Officer since October 2018. Mr. Smith previously served as Chief Operating Officer from September 2017 to October 2018, was our General Manager, Stitch Fix Men from March 2016 to September 2017, and served as our Chief Operating Officer from June 2012 to March 2016. From 2003 to 2012, Mr. Smith served in a variety of capacities at Walmart.com, Inc., an online retail company, including Vice President from 2008 to 2010 and Chief Operating Officer from 2010 to 2012. Mr. Smith holds a B.A. in Interdisciplinary Studies from the University of Virginia and an M.B.A. from the University of California, Berkeley.

7

**Defendant Anderson**

8

38.     Defendant Steven Anderson ("Anderson") has served as a Company director since April

9    2011. He also serves as a member of the Company's Compensation Committee. According to the 2019

10    Proxy Statement, as of October 21, 2019, Defendant Anderson beneficially owned 24,622,309 shares of

11    the Company's Class B common stock, which represented 52.8% of the Company's outstanding shares

12    of Class B common stock on that date. These shares are held by entities affiliated with Baseline

13    Ventures, a venture capital firm whose sole managing member is Defendant Anderson. Defendant

14    Anderson's beneficial stock ownership provides him with control approximately 47.2% of total voting

15    power over matters set for shareholder determination, making him a majority shareholder.

16

39.     The Company's 2019 Proxy Statement stated the following about Defendant Anderson:

17
18
19
20
21
22
23

**Steven Anderson.** Mr. Anderson has served on our Board since April 2011. Since 2006, Mr. Anderson has served as a general partner of Baseline Ventures, a venture capital firm of which he is the founder. Previously, Mr. Anderson served in a variety of positions at Microsoft Corporation, a multinational technology company, eBay Inc., an online marketplace, Starbucks Corporation, a food and beverage company, and Digital Equipment Corporation, a manufacturer and vendor of computer hardware, as well as a partner of Kleiner Perkins Caufield & Byers, a venture capital firm. Mr. Anderson holds a B.A. in Business from the University of Washington and an M.B.A. from the Stanford University Graduate School of Business. We believe Mr. Anderson is qualified to serve as a member of our Board due to his extensive experience with technology companies, including his experience as a venture capitalist investing in technology companies.

24

**Defendant Gurley**

25

40.     Defendant J. William Gurley ("Gurley") has served as a Company director since August

26    2013. He also serves as the Chair of the Company's Nominating and Corporate Governance Committee.

27    According to the 2019 Proxy Statement, as of October 21, 2019, Defendant Gurley beneficially owned

28

755,015 shares of the Company's Class A common stock, which represented 1.4% of the Company's outstanding shares of Class A common stock on that date. Defendant Gurley also beneficially owned 8,422,235 shares of the Company's Class B common stock, which represented 18.1% of the Company's outstanding shares of Class B common stock on that date. These shares of Class B common stock are held by entities affiliated with Benchmark Capital Partners, a venture capital firm controlled by Defendant Gurley. Given that the price per share of the Company's Class A common stock at the close of trading on October 21, 2019 was $22.99, Defendant Gurley owned approximately $17.3 million worth of Stitch Fix stock.

41.     The Company's 2019 Proxy Statement stated the following about Defendant Gurley:

*J. William Gurley.* Mr. Gurley has served on our Board since August 2013. Mr. Gurley serves as a general partner of Benchmark Capital, a venture capital firm, which he joined in 1999. Previously, he served as a partner of Hummer Windblad Venture Partners, a venture capital firm, a research analyst for Credit Suisse First Boston, an investment bank, and a design engineer at Compaq Computer Corporation, a manufacturer of computers and related components. Mr. Gurley holds a B.S. in Computer Science from the University of Florida and an M.B.A. from the University of Texas. We believe Mr. Gurley is qualified to serve as a member of our Board due to his extensive experience with technology companies, including his experience as a member of the boards of directors of public technology companies and as a venture capitalist investing in technology companies.

*Other Public Company Boards:* Mr. Gurley previously served as a director of Zillow Group, Inc., Grubhub, Inc., OpenTable, Inc., and Ubiquiti Networks, Inc.

### **Defendant Hansen**

42.     Defendant Marka Hansen ("Hansen") has served as a Company director since February 2014. She also serves as the Chair of the Company's Compensation Committee. According to the 2019 Proxy Statement, as of October 21, 2019, Defendant Hansen beneficially owned 166,875 shares of the Company's Class B common stock.

43.     For the fiscal year ended August 3, 2019, Defendant Hansen received $70,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

44.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hansen made the following sales of the Company's Class A common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 18, 2018 | 18,103 | $26.88 | $486,662 |
| June 22, 2018 | 4,018 | $30.00 | $120,540 |
| July 6, 2018 | 3,879 | $32.00 | $124,128 |

Thus, in total, before the fraud was exposed, she sold 26,000 Company shares on inside information, for which she received approximately $731,330. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

45.     The Company's 2019 Proxy Statement stated the following about Defendant Hansen:

**Marka Hansen.** Ms. Hansen has served on our Board since February 2014. Ms. Hansen previously served as a consultant to the Company from February 2013 to February 2014. From 2007 to 2011, she was the President of Gap North America, a subsidiary of The Gap Inc., a clothing retailer. Previously, Ms. Hansen served in various leadership positions at The Gap, including as President of Banana Republic, LLC, a division of The Gap. Ms. Hansen holds a B.A. in Liberal Studies from Loyola Marymount University. We believe that Ms. Hansen is qualified to serve as a member of our Board because of her experience in retail, design, and marketing.

*Other Public Company Boards:* Ms. Hansen has served as a director of J.Jill, Inc., an omnichannel, specialty women's apparel brand, since February 2017.

*Private Company / Non-Profit Boards:* Ms. Hansen serves as a director of Sur La Table and The Orvis Company.

## Defendant Lynch

46.     Defendant Kirsten Lynch ("Lynch") has served as a Company director since March 2018. She also serves as a member of the Company's Compensation Committee. According to the 2019 Proxy Statement, as of October 21, 2019, Defendant Lynch beneficially owned 25,715 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on October 21, 2019 was $22.99, Defendant Lynch owned approximately $591,187 worth of Stitch Fix stock.

47.     For the fiscal year ended August 3, 2019, Defendant Lynch received $189,429 in compensation from the Company. This included $57,500 in fees earned or paid in cash, $56,937 in stock awards, and $74,992 in option awards.

48.     The Company's 2019 Proxy Statement stated the following about Defendant Lynch:

**Kirsten Lynch.** Ms. Lynch has served on our Board since March 2018. Since 2011, Ms. Lynch has served as Executive Vice President and Chief Marketing Officer of Vail Resorts, Inc., a mountain resort company. From 2009 to 2011, she was with PepsiCo, Inc., a global beverage company, where she was Chief Marketing Officer of the Quaker Foods and Snacks Division. Prior to PepsiCo, Ms. Lynch was Vice President of Marketing for the Cheese and Dairy Business Unit of Kraft Foods Group, Inc., a grocery manufacturing company, from 2007 to 2009, and had worked for Kraft Foods since 1996, holding various marketing positions for the company's product divisions. Ms. Lynch began her marketing career with Ford Motor Company, a multinational automaker. She holds a B.A. in Marketing from the Illinois State University and an M.B.A. from Washington University in St. Louis. We believe Ms. Lynch is qualified to serve as a member of our Board due to her extensive marketing experience at premier global consumer brands.

### Defendant McCollam

49.     Defendant Sharon McCollam ("McCollam") has served as a Company director since November 2016. She also serves as the Chair of the Company's Audit Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of October 21, 2019, Defendant McCollam beneficially owned 38,200 shares of the Company's Class B common stock.

50.     For the fiscal year ended August 3, 2019, Defendant McCollam received $85,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

51.     The Company's 2019 Proxy Statement stated the following about Defendant McCollam:

**Sharon McCollam.** Ms. McCollam has served on our Board since November 2016. From December 2012 to June 2016, Ms. McCollam served as Executive Vice President, Chief Administrative and Chief Financial Officer of Best Buy Co., Inc., a provider of technology products, services, and solutions, and continued to serve as a senior advisor through January 2017. From 2006 to 2012, she served as Executive Vice President, Chief Operating and Chief Financial Officer at Williams-Sonoma Inc., a specialty retailer of high-quality products for the home, and as Chief Financial Officer from 2000 to 2006. Prior to Williams-Sonoma, Ms. McCollam served as Chief Financial Officer of Dole Fresh Vegetables, Inc., a division of Dole Food Company, Inc., a producer and marketer

of fresh fruit and vegetables. Ms. McCollam holds a B.S. in Accounting from the University of Central Oklahoma and is a Certified Public Accountant. We believe that Ms. McCollam is qualified to serve as a member of our Board because of her experience in retail and as a member of the boards of directors of public and private companies.

*Other Public Company Boards:* Ms. McCollam has served as a director of Chewy, Inc., an online retailer of pet products, since June 2019, Advanced Auto Parts, an automotive aftermarket parts provider, since February 2019, and Signet Jewelers, Limited, a diamond jewelry retailer, since March 2018. She previously served on the boards of directors of Whole Foods Market, Inc., OfficeMax Incorporated, Del Monte Foods Company, and Williams-Sonoma, Inc.

*Private Company / Non-Profit Boards:* Ms. McCollam serves as a director of Hallmark Cards, Inc., GetYourGuide AG, and Art.com. She also serves on the non-profit boards of Sutter Health and ALSAC/St. Jude Children's Research Hospital.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

52. By reason of their positions as officers, directors, and/or fiduciaries of Stitch Fix and because of their ability to control the business and corporate affairs of Stitch Fix, the Individual Defendants owed Stitch Fix and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Stitch Fix in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Stitch Fix and its shareholders so as to benefit all shareholders equally.

53. Each director and officer of the Company owes to Stitch Fix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Stitch Fix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55. To discharge their duties, the officers and directors of Stitch Fix were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Stitch Fix, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Stitch Fix's Board at all relevant times.

57.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GS, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

58.     To discharge their duties, the officers and directors of Stitch Fix were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Stitch Fix were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Stitch Fix's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Stitch Fix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Stitch Fix and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Stitch Fix's operations would comply with all applicable laws and Stitch Fix's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.     Each of the Individual Defendants further owed to Stitch Fix and the shareholders the duty of loyalty requiring that each favor Stitch Fix's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Stitch Fix and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, and directorial positions with Stitch Fix, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Stitch Fix.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Stitch Fix, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the

wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Stitch Fix and was at all times acting within the course and scope of such agency.

## STITCH FIX'S CODE OF CONDUCT

68.     Stitch Fix's Code of Conduct (the "Code of Conduct"), provides that it was adopted, in part to "ensur[e] that Stitch Fix's people are able to be their best selves while acting lawfully, responsibly, and with integrity." The Code of Conduct states the following, in relevant part:

> This Code of Conduct is part of ensuring that Stitch Fix's people are able to be their best selves while acting lawfully, responsibly, and with integrity. The Code is meant to help employees, officers, directors, and contractors (referred to collectively in this document as "employees" or "you") to understand your legal and ethical obligations and to reinforce Stitch Fix's commitment to honest and ethical conduct in all that we do. Stitch Fix expects all employees to understand and comply with this Code.

69.     In a section titled, "Compliance with Laws, Rules, and Regulations," the Code of Conduct states the following:

> Obeying the law, in letter and in spirit, is the minimum standard at Stitch Fix. We expect employees to understand the basic legal requirements applicable to their role. While you're not always expected to know the details of each law, it's important to know enough to determine when to seek advice from managers or the legal department, which you should do anytime you're uncertain about the application of any law to your work.

70.     In a section titled, "Insider Trading," the Code of Conduct emphasizes the prohibition on insider trading of material non-public information, stating the following:

> ***Employees who have access to material "inside" information about Stitch Fix or other companies are not permitted to use or share that information for stock trading purposes. All non-public information about Stitch Fix or about companies with which we do business is considered inside information***. Such information includes, without limitation, financial results, hiring plans, buying plans, business metrics, unannounced partnerships, and product changes. ***Information is "material" if it might be useful to an***

17

*investor in deciding to buy or sell securities of the company in question*. Using material non-public information in connection with buying or selling securities, including giving "tips" to others who might make an investment decision on the basis of that information, is a crime that can result in severe penalties. When handling inside information, take care to prevent its disclosure. You should only discuss inside information with other employees on a limited, "need to know" basis. You shouldn't share inside information with people outside of Stitch Fix other than people engaged by the Stitch Fix to provide professional assistance, and even then only on a "need to know" basis. If you have questions about making a stock trade or passing on non-public inside information, please refer to our Insider Trading Policy, contact the Stitch Fix legal department, or contact your personal legal counsel.

(Emphasis added).

71.     In a section titled, "Record-Keeping, Financial Controls, Disclosures, and Independent Auditors," the Code of Conduct provides that the Company "doesn't ever improperly adjust our reporting or recordkeeping for any reason," stating the following, in relevant part:

Stitch Fix doesn't ever improperly adjust our reporting or recordkeeping for any reason. *We record and report the truth*.

*We have adopted financial controls in accordance with Stitch Fix's internal needs and the requirements of applicable laws. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All employees, as applicable to your role, are expected to adhere to these procedures*. For most, that means proper documentation and reporting of expenses. For those working on our finance team, that means that any accounting adjustments that materially depart from generally accepted accounting principles must be approved by the audit committee of the Board of Directors and reported to Stitch Fix's independent auditors.

In addition, all material off-balance-sheet transactions, arrangements and obligations, contingent or otherwise, and other relationships of Stitch Fix with unconsolidated entities, must be disclosed to the audit committee of the Board of Directors, and independent auditors.

Stitch Fix employees also must not directly or indirectly take any action to coerce, manipulate, mislead or fraudulently influence Stitch Fix's independent auditors for the purpose of rendering the financial statements of Stitch Fix materially misleading.

Securities laws require full, fair, accurate, timely and understandable disclosure in our periodic reports with the Securities and Exchange Commission and that we fairly present our financial condition and results of operations. *Employees who are involved in or responsible for these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about Stitch Fix that would be important to enable stockholders and potential investors to*

1

2

*assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures*.

3

4

Violation of these provisions shall result in disciplinary action, up to and including termination, and may also subject the violator to substantial civil and criminal liability.

5

6

72.    In a section titled, "Compliance, Interpretation, Non-Retaliation, and Reporting Resources," the Code of Conduct states the following, in relevant part:

7

8

9

10

*Stitch Fix expects all employees to act in accordance with this Code and all other Stitch Fix policies*. Not doing so may result in disciplinary action up to and including termination. The proper action is not always obvious, so please feel welcome to ask your manager, the People and Culture team, or the legal department for help applying this Code to your particular situation. When the answer is not obvious to you, it's best to ask first, act later.

11

12

13

14

15

16

17

73.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and failing to report the same. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

18

## INDIVIDUAL DEFENDANTS' MISCONDUCT

19

### Background

20

21

74.    Stitch Fix is a California-based online retail company, which purports to offer a "client-centric," personalized fashion subscription service. The Company was founded with a focus on women's clothing, but has since branched out to include men's and children's apparel as well.

22

23

24

75.    Stitch Fix's common stock is divided into Class A stock, which confers one vote per share, and Class B stock, which confers ten votes per share. Only the Company's Class A stock is traded publicly; there is no public trading market for the Company's Class B stock. The Company's Class B stock automatically converts to Class A stock upon transfers or any sale.

25

26

27

28

76.     The Company differentiates itself from competing online fashion services through its purported use of data science. In the Company's annual report on Form 10-K for the fiscal year ended August 3, 2019 (the "2019 10-K"), the Company represents that it makes use of proprietary algorithms to gather a broad range of information about its customers' personal fashion tastes, stating the following:

> The very human experience that we deliver is powered by data science. Our data science capabilities consist of our rich data set and our proprietary algorithms, which fuel our business by enhancing the client experience and driving business model efficiencies. The vast majority of our client data is provided directly and explicitly by the client, rather than inferred, scraped, or obtained from other sources. We also gather extensive merchandise data, such as inseam, pocket shape, silhouette, and fit. This large and growing data set provides the foundation for proprietary algorithms that we use throughout our business, including those that predict purchase behavior, forecast demand, optimize inventory, and enable us to design new apparel. We believe our data science capabilities give us a significant competitive advantage, and as our data set grows, our algorithms become more powerful.
>
> *  *  *
>
> On average, each client directly provides us with over 90 meaningful data points through his or her style profile, including detailed style, size, fit, and price preferences, as well as unique inputs such as how often he or she dresses for certain occasions or which parts of his or her body the client likes to flaunt or cover up. Over time, through their feedback on Fixes they receive, clients share additional information about their preferences as well as detailed data about both the merchandise they keep and return. Historically, over 85% of our shipments have resulted in direct client feedback. This feedback loop drives important network effects, as our client-provided data informs not only our personalization capabilities for the specific client, but also helps us better serve other clients.

77.     The Company's fashion subscription service operates as follows: first, prospective customers complete a "Style Profile" on the Company's website, which includes the customer's fashion preferences, clothing sizes, and desired price range. Next, Stitch-Fix stylists compile a hand-selected collection of clothing, shoes, and other garments and accessories, tailored to the customer's indicated preferences. These collections, referred to by the Company as Fixes, are assembled from name-brand fashion products purchased from manufacturers, as well as original products designed in-house by Stitch Fix. Subsequently, the Fix is delivered to the customer, who may keep all, some, or none of the items in the Fix. Customers are charged for each item in the Fix they choose to keep, though U.S. customers receive a 25% discount if they elect to keep the entire Fix.

78.     Because Stitch Fix's business model revolves around a subscription-based service, one of the most significant metrics investors can use to gauge the Company's profitability is the number and growth of the Company's Active Clients.

79.     In the 2019 10-K, the Company defines its Active Clients as follows:

> We believe that the number of active clients is a key indicator of our growth and the overall health of our business. We define an active client as a client who checked out a Fix or was shipped an item using our new direct-buy functionality in the preceding 12-month period (52 weeks), measured as of the last day of that period. A client checks out a Fix when she indicates what items she is keeping through our mobile application or on our website. We consider each Men's, Women's, or Kids account as a client, even if they share the same household.

80.     The 2019 10-K lists only three other "key metrics" besides Active Clients (adjusted EBITDA, non-GAAP net income, and free cash flow).

81.     Prior to the beginning of the Relevant Period, the Company reported a high amount of Active Client growth. During the fiscal year ended August 2, 2014, the Company reported 261,000 Active Clients, which surged to 867,000 for the fiscal year ended August 1, 2015, 1.67 million for the fiscal year ended July 30, 2016, 2.19 million for the fiscal year ended July 29, 2017, and 2.74 million for the fiscal year ended July 28, 2018.

82.     The Company launched its national television advertisement campaign in 2017. Thereafter, in the months leading up to the beginning of the Relevant Period, Defendant Lake would represent on numerous occasions that the Company's television advertisement campaign was an integral driver of the Company's continued Active Client growth.

83.     For instance, at the Goldman Sachs Technology Internet Conference held on February 14, 2018, Defendant Lake stated the following about the impact of the Company's television advertisement campaign:

> We have a lot of room to find a lot of different types of productive channels and we are at a place now where we have a diverse set of channels.  TV works for us in a very performance-oriented way that we can attribute directly back to the spots that were airing. We put social I already talked about, their differences between men and women.  But we've been able to find a wide diverse range of channels where we're seeing very quick payback on that spend, and that continue to generate value after that.

84.     During a conference call held on March 12, 2018 to discuss the Company's earnings for the fiscal quarter ended January 27, 2018, Defendant Lake asserted that the Company's TV advertisements were directly linked to increased signs-ups (i.e., new Active Clients), stating the following:

> The mix between brand and performance, today the – I mean, almost everything that we do would be categorized as performance. ***And so even on the TV front, for example, the TV spots that we're running, our direct response, we can attribute those within kind of a 5-second window directly to sign-ups that we're seeing in response to that***. And so I think it's definitely an opportunity as we think about the longer term of the company and the kind of the longer-term horizon as the types of marketing that we want to do in building a brand that people know and love and that really has this kind of hearts and minds type of place with consumers. And it's an area that we're excited about. And I think we – you'll see over the course of, I don't know, a year or so, that you'll probably see us experiment with more types of marketing. But today, the vast majority of the marketing spend that you see would be more of what people would consider performance marketing.

(Emphasis added).

85.     At the JP Morgan Global Technology, Media and Communications Conference held on May 16, 2018, in response to a question about what was "working best" for the Company in terms of its marketing strategies, Defendant Lake again touted the Company's television advertisement campaign, stating, "[w]e use TV. TV, we use all-in kind of a direct response way. We were attributing back, I think, within 7 seconds of people seeing a spot and signing up. So we use a very data-driven ROI approach . . . ."

86.     As revealed in a press release and letter to shareholders issued by the Company on October 1, 2018, the Company had in fact halted its national television advertisement campaign for 10 weeks out of the 13 weeks in the fiscal quarter ended April 28, 2018, or approximately 80% of the quarter. Moreover, Active Client growth had essentially slowed to a halt during the quarter. Despite this, the Individual Defendants personally made and caused the Company to make multiple statements through SEC filings, press releases, and conferences during the Relevant Period assuring the investing public that the Company was maintaining strong Active Client growth, and that this growth was being driven by the Company's television advertising campaign.

**False and Misleading Statements**

*June 7, 2018 Press Release and Letter to Shareholders*

87.     During after-market hours on June 7, 2018, The Company issued a press release announcing the Company's financial results for the fiscal quarter ended April 28, 2018. The press release reported that the Company's Active Clients had grown by 30% year over year, up to 2.7 million, stating the following:

> Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for its third quarter of fiscal year 2018 ended April 28, 2018 and posted a letter to its shareholders on its investor relations website. Highlights include delivering:
>
> - Active clients of 2.7 million, an increase of 30% year over year
> - Net revenue of $316.7 million, an increase of 29% year over year
> - Net income of $9.5 million and adjusted EBITDA of $12.4 million
> - Diluted earnings per share of $0.09

88.     The press release also quoted Defendant Lake as follows:

> "In addition to driving strong net revenue, net income, and adjusted EBITDA, we grew our active client count to 2.7 million, an increase of 30% year-over-year," said Stitch Fix founder and CEO Katrina Lake. "We continue to balance growth and profitability, demonstrated by our ability to consistently deliver top-line growth of over 20% even as we invest in category expansions, technology talent, and marketing. Our third quarter results demonstrate continued positive momentum for Stitch Fix and the power of our unique ability to deliver personalized service at scale."

89.     Also on June 7, 2018, the Company published a letter to its shareholders, which echoed the representations made in the press release issued that same day with respect to the Company's Active Client growth. The letter to shareholders also reported on the Company's investments in advertising, stating the following, in relevant part:

> We continue to make strategic and measured marketing investments designed to achieve near-term payback.  In Q3'18, advertising expense was $25.2 million, or 8.0% of net revenue.  Our Q3'18 advertising spend increased relative to our Q3'17 expense of $21.3 million, or 8.7% of net revenue.
>
> * * *
>
> Advertising expenses include the costs associated with the production of advertising, television, radio and online advertising.

1

2    *June 7, 2018 Conference Call*

3        90.    Later during the day on June 7, 2018, Defendants Lake, Yee, and Smith attended a

4    conference call with investors held to discuss the Company's financial results for the fiscal quarter

5    ended April 28, 2018. During the call, Defendant Lake echoed the Active Client growth figures given in

6    the press release and letter to shareholders issued by the Company earlier that day, stating, "We grew

7    our active client count to 2.7 million as of April 28, 2018, an increase of 614,000 and 30% year-over-

8    year."

9        91.    Defendant Lake also touted the Company's marketing efforts, and the role those efforts

10   played in growing the Company's client base, stating the following:

11       Our second pillar for growth is in serving new clients.  We believe that we have
         significant opportunities to acquire new clients in our existing business.  The 30% year-
12       over-year growth we've seen in active client count is the result of these efforts, efficiently
13       leveraging our performance, marketing capabilities and increasing our brand awareness.

14       92.    Also during the conference call, an analyst questioned Defendant Yee about the

15   Company's increased financial guidance, asking if Defendant Yee could "give us a little bit more detail

16   about what drove the upside to guidance in the quarter.  I think revenue per active client was flattish in

17   the quarter after declines in prior quarters, so just curious what drove that specifically . . . ."

18       93.    Defendant Yee responded as follows:

19       Just to add on to our results for the quarter, our 29% retail growth – retail sales growth
20       was above our range of 22% to 26% and really went – from a driver's standpoint, we
         grew active clients by 30% year-over-year, and that's both for our Women's and Men's
21       categories.  And we're really pleased with efficiencies we've seen with our marketing
22       spend to attract new clients as well as ability to reengage and engage clients with the
         various tools we have to really please our clients.
23

24   *June 8, 2018 Form 10-Q*

25       94.    On June 8, 2018, the Company filed with the SEC its quarterly report for the fiscal

26   quarter ended April 28, 2018 on Form 10-Q (the "June 2018 10-Q"). The June 2018 10-Q was signed by

27   Defendants Lake and Yee, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under

28   the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lake and Yee

attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.     With respect to the Company's marketing efforts, and the Company's use of television advertising, the June 2018 10-Q stated the following, in relevant part:

> To grow our business, we must continue to acquire clients and successfully engage them. ***We believe that implementing broad-based marketing strategies that increase our brand awareness has the potential to strengthen Stitch Fix as a national consumer brand, help us acquire new clients and drive revenue growth***. As our business has achieved a greater scale and we are able to support a large and growing client base, ***we have increased our investments in marketing to take advantage of more marketing channels to profitably acquire clients***. For example, we recently significantly increased our advertising spend, from $21.3 million and $46.8 million for the three and nine months ended April 29, 2017 to $25.2 million and $73.2 million for the three and nine months ended April 28, 2018, respectively, to support the growth of our business. We expect to continue to make significant marketing investments to grow our business. We currently utilize both digital and offline channels to attract new visitors to our website or mobile app and subsequently convert them into clients. ***Our current marketing efforts include client referrals, affiliate programs, partnerships, display advertising, television, print, radio, video, content, direct mail, social media, email, mobile "push" communications, search engine optimization and keyword search campaigns***.

(Emphasis added).

96.     The June 2018 10-Q also contained a list of risk disclosures, which included, under the subheading titled, "[o]ur continued growth depends on attracting new clients," the following disclosure:

> Our success depends on our ability to attract new clients in a cost-effective manner. To expand our client base, we must appeal to and acquire clients who have historically used other means to purchase apparel, shoes and accessories, such as traditional brick-and-mortar apparel retailers or the websites of our competitors. We reach new clients through paid marketing, referral programs, organic word of mouth and other methods of discovery, such as mentions in the press or internet search engine results. ***Starting in calendar year 2017, we began to increase our paid marketing expenses by investing more in digital marketing and launching our first television advertising campaigns. We expect to increase our spending on these and other paid marketing channels in the future and cannot be certain that these efforts will yield more clients or be cost-effective***. Moreover, new clients may not purchase from us as frequently or spend as much with us as existing clients, and the revenue generated from new clients may not be as high as the revenue generated from our existing clients. These factors may harm our growth prospects and our business could be adversely affected.

(Emphasis added).

### *Articles and Analyst Reports Following the Company's Financial Disclosures*

97.     The market reacted favorably in the wake of the Company's financial results disclosed on June 7, 2018 and June 8, 2018, with the price of the Company's stock swelling from $19.67 per share at the close of trading on June 7, 2018, to a high of $25.38 during intraday trading on June 8, 2018, representing an increase of over 29% on unusually heavy volume of 12.6 million shares. Additionally, a number of news outlets and analysts commented on the Company's purportedly optimistic growth prospects.

98.     On June 7, 2018, CNBC aired a segment discussing the Company's financial results, and published an article titled, "Stitch Fix soars after online styling service says active clients grew 30%."[2] The article stated that the Company had exceeded Wall Street's forecast of 2.66 million in Active Clients, and referenced the Company's "strong earnings and user growth."

99.     On June 8, 2018, RBC Capital Markets published an analyst report titled, "Q3:18 was a 'good fit,'" which stated, "Stitch Fix's Active Clients came in at 2.688MM, above the Street's expectation of 2.665MM and our expectation of 2.675MM. These were positive results, with Active Client Growth remaining healthy at 30% Y/Y."

100.     On June 8, 2018, Barclays published a report on the Company, which stated, "[p]ositives In 3Q: . . . Active Client growth was stable at 30% Y/Y and the 614K net additions Y/Y was the highest level in several quarters."

101.     On June 8, 2018, Piper Jaffray issued an analyst report titled, "Well Executed Q3; Strong Initiatives & Scaling Supply Chain Keep Us Optimistic," which stated, "SFIX revenue of $317M (+29% Y/Y) came in above consensus expectations for $307M. Q/Q active clients accelerated on a Y/Y basis for the third straight quarter to 2.7M."

102.     On June 8, 2018, William Blair published an analyst report titled, "Beat-and-Raise Quarter on Top and Bottom Line; Introducing Stitch Fix Kids," which stated, in relevant part, "Stitch Fix shares are up about 6% in the aftermarket, likely due to strong financial performance on the quarter,

---

[2] https://www.cnbc.com/2018/06/07/stitch-fix-earnings-q3-2018.html (last visited December 10, 2019).

as well as boosted guidance for the full year.  As active clients continue to grow in the 30% range for the fourth straight quarter, we believe that investors remain excited for the large opportunity moving forward."

103.    On June 19, 2018, CNBC published an additional article on the Company, titled, "Trader: this Company could be the 'Netflix of apparel.'"[3] The article commented on the Company's Active Client growth, stating the following, in relevant part:

> On Monday, Ritholtz Wealth Management CEO and "Halftime Report" trader Josh Brown bought Stitch Fix since he believes it could become the "Netflix of apparel."
>
> * * *
>
> "If you look at the trouble the apparel companies have had building an online business fast enough to offset the decline in foot traffic Stitch Fix might be an answer," he said on Monday's "Halftime Report." "It may become the Netflix of apparel."
>
> Brown also likes the fundamentals of the company. He noted that it is "growing its user base by an outstanding number" and that it's also showing accelerating revenue. "I think they found a way to build a business in apparel online that just absolutely delights their customers," he said
>
> * * *
>
> The company most recently reported quarterly results on June 7 that topped analyst estimates for both earnings and revenue, and the number of subscribers grew 30% in Q3 compared to a year earlier. The stock has soared 33% since the company announced results.

### *July 15, 2018 Today Show*

104.    On July 15, 2018, Defendant Lake made an appearance as a guest on NBC's Today Show. On the Today Show, Defendant Lake discussed how Stitch Fix had launched with only 29 customers, as NBC displayed a digital graphic showcasing the Company's purported 2.7 million Active Clients.

### *Subsequent Favorable Articles and Analyst Reports on the Company*

105.    On August 9, 2018, SunTrust Robinson Humphrey Capital Markets started coverage of the Company, issuing an analyst report titled, "Disruptive by Design; Initiate with Buy/$38 PT." The article referred to the Company's Active Clients as a "key revenue driver," stating the following:

---

[3]    https://www.cnbc.com/2018/06/19/trader-this-company-could-be-the-netflix-of-apparel.html   (last   visited December 11, 2019).

Stitch Fix also reports two top line KPIs on a quarterly basis: active clients and net revenue per active client.

Active Clients is a key revenue driver.

(i)      Active Clients: An active client is defined as somebody that has checked out a Fix in the last 12 months.  A client "checks out" a Fix when he/she indicates which item(s) he/she is keeping through the company's mobile app or website.

106.     The SunTrust Robinson Humphrey Capital Markets analyst report also commented on the Company's representations concerning its use of advertising, stating the following, in relevant part:

The core Women's category caters to sizes 0-14 (less than 50% of women in the U.S.), and though recently the category has decelerated, we believe there is still plenty of room for growth in this ~$100B market (Coresight).  For example, through the first five years, the majority of the growth was more organic in nature, as the company utilized word of mouth, customer referrals and social media influencers/bloggers.  As of a May 2017, aided brand awareness for women with household income above $50K and ages 21-65 was just 41% (Millward Brown), and we believe investments in both traditional and online advertising channels should help grow this metric, and in turn allow the company to acquire new customers.

* * *

We believe Stitch Fix will be able to attract new clients as the company leans into advertising.  Importantly, the company has stated customer acquisition costs have remained stable over the last few quarters, suggesting this level of relative spend is the new normal.  We note the company has provided a long-term target of advertising expenses representing 9-11% of total revenues (vs. 9% for FY 2018E).

107.     On September 25, 2018, J.P. Morgan published an analyst report titled, "Thoughts Into 4QFY18 Earnings: Focus on FY19 Revenue Guide, w/Consensus Low & Expectations High; Neutral, $36 PT." The report commented on the connection between the Company's Active Client growth and its revenue growth, stating the following, in relevant part:

Stitch Fix reports 4Q earnings on Monday, 10/1 after market close, with the 5pm ET conference call available at: US: (800) 458-4121; Int'l: (323) 794-2093; Passcode: 8417189.  We're looking for:

1)      Active Clients of 2.808M (+28% Y/Y), driven by Women's Active Clients of 2.510M (+23% Y/Y) & Men's Active Clients of 298k (+94% Y/Y).  We do not model any contribution from Kids, which launched on 7/10, given SFIX's 4Qend of 7/28.

108.    On September 28, 2018, RBC Capital Markets published an analyst report titled, "FQ4 Preview & Cheat Sheet," which commented on the Company's Active Clients as being a key metric, stating the following:

> Key Metrics to Focus On: 1) Active Clients: For FQ4:18 we estimate 2.8MM active clients, up 29% Y/Y on 6-pt easier comp.  This translates to 148K new active clients; 2) Revenue Per Client: For FQ4 we estimate $433 in Annual Revenue Per Client, down (3%) Y/Y, and flat from FQ3, primarily due to a mix-shift to the Men's and Plus categories.

109.    The statements in ¶¶ 87–91, 93–96, and 104 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's Active Client growth had stagnated significantly; (2) the Company had planned to, and did, discontinue its national television advertisement campaign for 10 out of the 13 weeks comprising the fiscal quarter ended April 28, 2018; (3) the cessation of the Company's national television advertisement campaign was a major contributing factor to the stagnation of the Company's Active Client growth; (4) as a result of the Company's stagnated Active Client growth, the Company's financial prospects and purported "positive momentum" were far weaker than the Company had represented to the investing public; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

### *October 1, 2018 Press Release and Letter to Shareholders*

110.    During after-market hours on October 1, 2018, the Company issued a press release containing the Company's financial results for the fiscal quarter ended July 28, 2018. The press release reported 2.7 million Active Clients, revealing that the Company's Active Client growth had entirely stagnated throughout the quarter. The press release stated the following, in relevant part:

> Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for the fourth quarter and full fiscal year 2018 ended July 28, 2018 and posted a letter to its shareholders on its investor relations website.
>
> Fourth quarter highlights

- Active clients of 2.7 million, an increase of 25% year over year
- Net revenue of $318.3 million, an increase of 23% year over year
- Net income of $18.3 million and adjusted EBITDA of $11.1 million
- Diluted earnings per share of $0.18

111.    Also on October 1, 2018, the Company issued a letter to shareholders, which for the first time revealed that the Company had temporarily ceased airing national television advertisements for 10 weeks, which constituted roughly 80% of the fiscal quarter ended July 28, 2018. The letter to shareholders stated the following, in relevant part:

> In Q4'18, we continued our measured and analytical approach to paid advertising as we tested key channels to better understand how to most effectively allocate our marketing spend.  Specifically, during the quarter we performed a TV incrementality test, during which we temporarily ceased our national TV campaign for 10 weeks to measure the channel's efficacy.

112.    The letter to shareholders also revealed that the Company's Active Clients had only grown by a mere 54,000 during the quarter, which was the smallest amount of Active Client growth during a fiscal quarter that the Company had ever reported.

### October 1, 2018 Conference Call

113.    On October 1, 2018, Defendants Lake, Yee, and Smith attended a conference call with analysts held to discuss the Company's earnings for the fiscal quarter ended July 28, 2018. During the call, Defendant Smith echoed the statement made in the letter to shareholders issued on October 1, 2018 that the Company had "temporarily ceased" its television advertisement campaign.

114.    Analysts questioned Defendants Lake during the call about the discontinuation of the Company's television advertising campaign, and the Company's disappointing Active Client growth. A Piper Jaffray analyst asked Defendant Lake the following question:

> I recognized you took the TV off during the majority of the quarter.  But if you were to – knowing what you know now about how effective that is, if that had been on throughout the quarter as you may have had in the past, what would customer net adds have looked like?  Is there a way to kind of back into that?

115.    In response, Defendant Lake merely stated, "on the first question around TV and just the specifics of it, unfortunately, we don't have that data to share."

116.    Also during the call, a Barclays analyst asked Defendant Lake the following question:

So if we look at client net adds quarter-on-quarter, they were only up about 54,000 from last quarter.  That cadence was a bit lower than the previous trend line.  So is that mostly just cutting back the TV program?  Or is there a different mix of one and dones from these new categories that are growing fast?  And any other color on the net adds would be helpful.

117.    Defendant Lake responded as follows:

I think we're looking good in terms of kind of a year-over-year rate and we saw active clients grow 25% year-over-year.  We're really happy with kind of the foundational fundamental that really helped us to achieve that higher end of our guidance range.  We don't have any of – we wouldn't say that this is a quality issue of like – that we have more one and dones.  I mean, if anything, I think this is a business where we're really focusing on client quality and really focusing on ROI and LTV and how clients are demonstrating value over the long term.  And the more that we're able to learn through things like the TV incrementality test, the more we're able to hone that and really improve that over time.  And so I think these are – our top line revenue is consistent with where we shared that we would be and consistent with where we plan to go in the future, and I think the underlying fundamentals are ones that we're happy with.

118.    A JP Morgan analyst questioned Defendant Lake further about the Company's television advertisement campaign, asking for more details on the "better returns on the TV side than you expected." Defendant Lake responded as follows:

I think the way to think about that is just that it's really us fine-tuning, understanding how all of our different marketing channels contribute to our portfolio.   Marketing diversification is something we've talked about for a long time.  And we always knew that TV was an important component of that, but I think having gone through this test and having really understood more granularly how TV impacts, I think, we feel like it's a really important part of the portfolio and you'll continue to see us invest there.

119.    Following the Company's financial disclosures and conference call on October 1, 2018, the price of the Company's stock dropped precipitously, from $44.63 per share at the close of trading on October 1, 2018, to $28.94 per share at the close of trading on October 2, 2018, representing a significant loss in value of over 35%.

120.     Unsurprisingly, analysts reacted negatively to these disclosures, generally concluding that the Company's disappointing Active Client growth was largely due to the Company's previously unrevealed cessation of its television advertisement campaign.

121.     On October 1, 2018, the Wall Street Journal published an article titled, "Fashion Emergency at Stitch Fix."[4] The article emphasized the dire implications of the Company's stagnated Active Client growth, stating the following:

> When Stitch Fix, . . . a subscription fashion service, had its initial public offering last November, investors were skeptical.  How many people would continue to pay for constant wardrobe updates?
>
> In its first quarters as a public company, Stitch Fix defied the skeptics and posted consistent growth, raising hopes that it could succeed where other subscription services have failed.  The stock had gained 73% this year through Monday's close.  Monday's fiscal fourth-quarter results show that the bullish thesis may be coming apart at the seams.
>
> * * *
>
> [T]he key figure for this or any other subscription-based company is how many customers it can keep engaged.  Stitch Fix missed estimates for active clients, which were expected to reach 2.8 million.  Instead, that figure stagnated at 2.7 million, exactly where it had been at the end of the previous quarter, although that still is 25% higher than a year earlier.  Shares fell by one-fifth in after-hours trading.

122.     On October 1, 2018, Piper Jaffray published an analyst report titled, "Remain Sidelined Post Q4 Net Adds Miss; Ests. Moving Lower on Guidance; $31 PT." The report stated the following:

> We believe newer businesses (men's) continued to grow solidly but believe the core women's business has decelerated – not just in Q4 but in Q1 we note kid's will be a revenue contributor in Q1.  Net adds (+55k Q/Q) were the lowest sequential adds we've seen in the last 12 quarters.  To be fair, TV advertising was paused in 10 weeks of the quarter in a test and clearly had an adverse impact on this number.  As TV ads have now been reactivated in Q1, we will be monitoring the attach rate of new customers.

123.     On October 1, 2018, RBC Capital Markets published an analyst report titled, "FQ4:18: No Need To Get Your Fundies in A Bunch." The report commented on the Company's "record lows" in growth, stating the following, in relevant part:

---

[4] https://www.wsj.com/articles/fashion-emergency-at-stitch-fix-1538431903 (last visited December 12, 2019).

Mixed FQ4 Results: Revenue of $318MM came in slightly below RBC/Street @ $319MM, largely due to lower than expected Active Clients. (Overly?) aggressive ad testing – a 10-week cessation of a national TV campaign – was likely a factor.  Gross Margin of 44.4% came in above RBC/Street at 43.7%/43.5%, due to a decrease in inventory reserve and clearance expense, as well as reduced shrink.  EBITDA of $11.1MM came in above RBC/Street @ $10MM.  FQ1 Revenue & EBITDA Guide Midpoints were below Street, while FY19 Revenue Guide Midpoint was above, while EBITDA range was below.  All in, FQ4 Fundamentals were mixed – Revenue Growth and Client Net Adds were both Record Lows, tho Gross Margin & EBITDA Margin both climbed nicely Y/Y.

The Quarter Keys: 1) Active Clients Were Light: Came in at 2.74MM, below the Street @ 2.81MM, with 54K Net Adds vs. 180K in FQ3:18 and 120K in FQ4:17.  Weak results.

* * *

Stitch Fix's Active Clients came in at 2.74MM (up 25% Y/Y vs. 30% Y/Y in F3Q:18), below the Street's expectation of 2.81MM and our expectation of 2.84MM.  This translates to ~54K in net additions (lowest we have seen yet) vs. our expectation of 148K.  While management did not call out any material cause for this decel, we believe that halting national TV campaigns for 10 weeks could have been a key reason.

124.    On October 1, 2018, Wells Fargo published an analyst report titled, "SFIX: Top-Line That Needs a 'Fix,' 4Q Print Creates Some Concern." The report described the Company's Active Client growth as "the smallest net add number seen in 2 years," stating the following:

So, expectations aside, what was wrong with their 4Q print? A few key points: 1) SFIX missed sales – they hit the high-end of plan but missed the Street.  Digging deeper, net customer adds were just +2% from 3Q – said differently, they added just 54K active customers in 4Q, the smallest net add number seen in 2 years (and potentially longer, our model doesn't go back that far).

* * *

The Bear Case . . . . We believe investors who are bearish on SFIX highlight that (1) top-line growth will come at the expense of margins as SFIX ramps its new categories, which are lower GM (mainly due to being sub-scale) (2) active member growth is moderating just as ad spend has stabilized – which shows that the business requires significant investment in customer acquisition if it wants to remain a 20-25% top-line grower and (3) top-line is slowing quickly despite new category additions, illustrating weakness in the "core."

125.    On October 1, 2018, SunTrust Humphrey Robinson published an analyst report titled, "Inline Quarter Fails to Impress; Fundamentals Intact/Maintain Buy." The report pointed to the Company's cessation of its television advertisement campaign as a factor impacting the Company's Active Client growth, stating the following:

Key KPIs Under-whelming; Questions Remain Around Marketing Efficiency. Sequential net adds were 54K as active clients (as of period end) were 2.74M, below consensus expectations of 2.81M. [. . .] One of the issues on investors' mind is the decline in marketing efficiency this quarter, as advertising expenses were up Y/Y while sequential net adds of 54K this Q were below the 120K net adds in the year ago period. We note that there are several factors impacting this metric including investment in new categories (Plus, Kids, assortment across price points), and testing /experimenting. Here, the company experimented with its advertising budget throughout the quarter by pausing its national TV campaign, and continuing some regional spend. This may have had some influence over marketing efficiency, though the company would not quantify the impact.

126.    On October 2, 2018, William Blair published an analyst report titled, "Greater-Than-Expected Deceleration of Active Clients Overshadows Plans to Launch Internationally." The report discussed the impact of the Company's disappointing Active Client growth on the Company's share price, stating, "Stitch Fix shares are down about 20% in the aftermarket, likely due to greater-than-expected deceleration on active clients and revenue, as well as lower-than expected EBITDA guidance for fiscal 2019."

127.    On October 2, 2018, Barclays published an analyst report titled, "Solid 4Q, Despite Missing Buyside." The report stated the following, in relevant part:

The one area we were surprised was marketing efficiency eroding. SFIX pulledback on national TV advertising (and continued to run some local TV) to test efficacy, which negatively weighed on both client growth and marketing efficiency. Active client growth slowed to 25% Y/Y, and SFIX added just 54K net clients Q/Q, the lowest yet, with much higher ad expense-per-net-add.

128.    As of December 10, 2019, the Company's stock trades as low as $26.23 per share, nearly half of the $51.19 per share peak the Company's share price had reached during the Relevant Period.

## DAMAGES TO STITCH FIX

129.    As a direct and proximate result of the Individual Defendants' conduct, Stitch Fix has lost and expended, and will lose and expend, many millions of dollars.

130.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its CFO, and its President and COO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

131.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

132.    As a direct and proximate result of the Individual Defendants' conduct, Stitch Fix has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

133.    Plaintiff brings this action derivatively and for the benefit of Stitch Fix to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Stitch Fix, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

134.    Stitch Fix is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

135.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Stitch Fix. Plaintiff will adequately and fairly represent the interests of Stitch Fix in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

136.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

137.    A pre-suit demand on the Board of Stitch Fix is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Lake, Anderson, Gurley, Hansen, Lynch, and McCollam (the "Director-Defendants"), and non-parties Mikkel Svane and Elizabeth Williams (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

138.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of them engaged in insider sales based on material non-public information, netting proceeds of over $14.2 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

139.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

140.    Additional reasons that demand on Defendant Lake is futile follow. Defendant Lake is the founder of the Company and has served as the Company's CEO since its inception in 2011. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Lake with her principal occupation, and she receives handsome compensation, including $5,327,433 during the fiscal year ended August 3, 2019. Additionally, Defendant Lake's beneficial stock ownership provides her with control of approximately 24.2% of total voting power over matters set for shareholder determination, giving her substantial control over the continued employment of the Directors. Defendant Lake was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing conference calls and press releases, most of which she personally made statements in, and the June 2018 10-Q, which she signed. As the Company's highest officer and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales before the fraud was exposed, which yielded at least

$13.5 million in proceeds, demonstrates her motive in facilitating and participating in the fraud. Moreover, Defendant Lake is a defendant in the Securities Class Action. For these reasons, too, Defendant Lake breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Anderson is futile follow. Defendant Anderson has served as a Company director since April 2011. He also serves as a member of the Compensation Committee. Moreover, Defendant Anderson's beneficial stock ownership provides him with control of approximately 47.2% of total voting power over matters set for shareholder determination, making him a majority shareholder. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Gurley is futile follow. Defendant Gurley has served as a Company director since August 2013. He also serves as the Chair of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Gurley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Hansen is futile follow. Defendant Hansen has served as a Company director since February 2014. She also serves as the Chair of the Compensation Committee. Defendant Hansen has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements,

consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales before the fraud was exposed, which yielded at least $731,330 in proceeds, demonstrates her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Hansen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.     Additional reasons that demand on Defendant Lynch is futile follow. Defendant Lynch has served as a Company director since March 2018. She also serves as a member of the Compensation Committee. Defendant Lynch has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Lynch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

145.     Additional reasons that demand on Defendant McCollam is futile follow. Defendant McCollam has served as a Company director since November 2016. She also serves as the Chair of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant McCollam has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant McCollam breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.     Additional reasons that demand on the Board is futile follow.

147.    As described above, two of the Director-Defendants on the Board directly engaged in insider trading, in violation of federal law. Defendants Lake and Hansen collectively received proceeds of over $14.2 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

148.    Demand in this case is excused because the Directors, six of whom are named as defendants in this action, are beholden to and controlled by Defendant Anderson, who controls the Company by virtue of his share ownership, which provided him with approximately 47.2% of total shareholder voting power as of October 21, 2019. These shareholdings provide Defendant Anderson with significant control over the continued employment of the Directors. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Anderson's control over them.

149.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

150.    Defendants Gurley, Hansen and McCollam, (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's accounting and financial reporting processes, the integrity of the Company's financial statements and reports, and the adequacy of the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting methods and to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

151.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. Two of the Director-Defendants violated the Code of Conduct by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

152.    Stitch Fix has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Stitch Fix any part of the damages Stitch Fix suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

153.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

154.    The acts complained of herein constitute violations of fiduciary duties owed by Stitch Fix's officers and directors, and these acts are incapable of ratification.

155.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Stitch Fix. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Stitch Fix, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

156.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Stitch Fix to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

157.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

158.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Stitch Fix's business and affairs.

160.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

161.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Stitch Fix.

162.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

163.    In further breach of their fiduciary duties owed to Stitch Fix, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's Active Client growth had stagnated significantly; (2) the Company had planned to, and did, discontinue its national television advertisement campaign for 10 out of the 13 weeks comprising the fiscal quarter ended April 28, 2018; (3) the cessation of the Company's national television advertisement campaign was a major contributing factor to the stagnation of the Company's Active Client growth; (4) as a result of the Company's stagnated Active Client growth, the Company's financial prospects and purported "positive momentum" were far weaker than the Company had represented to the investing public; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

164.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

165.    In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

166.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material

misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

167.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

168.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

169.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stitch Fix has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.    Plaintiff on behalf of Stitch Fix has no adequate remedy at law.

### SECOND CLAIM

**Against Individual Defendants for Unjust Enrichment**

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Stitch Fix.

173.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and

misleading statements, or received bonuses, stock options, or similar compensation from Stitch Fix that was tied to the performance or artificially inflated valuation of Stitch Fix, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

174.    Plaintiff, as a shareholder and a representative of Stitch Fix, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

175.    Plaintiff on behalf of Stitch Fix has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

178.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

179.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

180.    Plaintiff on behalf of Stitch Fix has no adequate remedy at law.

### FOURTH CLAIM

**Against Defendants Lake, Yee, and Smith for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.   Stitch Fix, along with Defendants Lake, Yee, and Smith are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Lake, Yee, and Smith's willful and/or reckless violations of their obligations as officers and/or directors of Stitch Fix.

183.   Defendants Lake, Yee, and Smith, because of their positions of control and authority as officers and/or directors of Stitch Fix, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Stitch Fix, including the wrongful acts complained of herein and in the Securities Class Action.

184.   Accordingly, Defendants Lake, Yee, and Smith are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

185.   As such, Stitch Fix is entitled to receive all appropriate contribution or indemnification from Defendants Lake, Yee, and Smith.

## <u>PRAYER FOR RELIEF</u>

186.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Stitch Fix, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Stitch Fix;

(c)   Determining and awarding to Stitch Fix the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Stitch Fix and the Individual Defendants to take all necessary actions to

reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Stitch Fix and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2. a provision to permit the shareholders of Stitch Fix to nominate at least four candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Stitch Fix restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 12, 2019                    Respectfully submitted,

**GREEN & NOBLIN, P.C.**

*/s/Robert S. Green*
Robert S. Green

James Robert Noblin
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email: gnecf@classcounsel.com

1

*Liaison Counsel for Plaintiff*

2

**THE BROWN LAW FIRM, P.C.**

3

Timothy Brown
240 Townsend Square

4

Oyster Bay, NY 11771
Telephone: (516) 922-5427

5

Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

6

7

*Counsel for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Jude Chamberlain am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2019.

12/4/2019

DocuSigned by:

Jude Chamberlain

C1A8AA8C343E4F9...

Jude Chamberlain